UNITED STATES of America,
Plaintiff,

v.

Victorino Sandoval SEPULVEDA,
Defendant.

No. CR 05–24–BU–DWM–04.

United States District Court,
D. Montana,
Butte Division.

July 31, 2007.

Josh Van De Wetering, Office of the U.S. Attorney, Missoula, MT, for Plaintiff.

ORDER

MOLLOY, Chief Judge.

### I. Introduction

Attorney John Hud was appointed in this case pursuant to the Criminal Justice

Act (CJA), 18 U.S.C. § 3006A, to represent Defendant Sepulveda. Hud has submitted a CJA voucher and supporting documentation seeking total compensation of $12,628.66 (as adjusted by the Clerk of Court's mathematical audit), including costs and travel expenses. The amount requested exceeds the statutory maximum payment by $4,067.60.[1] Hud filed a memorandum in support of his claim on June 20, 2007. I have reviewed the memorandum along with Hud's voucher and supporting materials, and issued an Order dated July 13, 2007, advising Hud that his claim is excessive and stating the Court's intention to reduce the claim to $10,374.66. Hud asked for a hearing on the matter, which was held on July 25, 2007. Having listened to Hud's explanations and arguments, it is my view that the voucher is excessive and must be reduced. To prepare for the hearing, I reviewed Hud's CJA billing history for the past three years and it, like Banquo's ghost, reveals a troubling pattern of excess.

## II. Analysis

### A. The Sepulveda Voucher

A criminal defendant who is unable to pay an attorney is entitled to have counsel appointed and compensated through the Criminal Justice Act. 18 U.S.C § 3006A(b). That compensation is limited by Congress to $7,000.00 in cases involving felony charges. 18 U.S.C. § 3006A(d)(2). Excess payment above the limit set in § 3006A(d)(2) may not by law be made unless the presiding judge certifies to the chief judge of the circuit that the representation was extended or complex and that the amount of the excess payment is necessary to provide fair compensation. 18 U.S.C. § 3006A(d)(3). This process is not one involving a "rubber stamp." It is a meaningful congressionally mandated step

that requires detailed justification not only by the lawyer, but also by the approving judge. Section 2.22(C)(2) of the Guidelines for the Administration of the Criminal Justice Act requires CJA counsel seeking excess compensation to justify the request with a supporting memorandum.

In this case, Sepulveda was charged in two counts of a 102–count Indictment. One count charged conspiracy to distribute methamphetamine and one count charged distribution of methamphetamine. Hud argues in his memorandum that excess payment is necessary and justified because Sepulveda's case is both extended and complex. In my judgment, he is wrong and off the mark on both notions, excepting some travel.

The case is extended, according to defense counsel, because he had to communicate with his client through an interpreter, and because he had to make several trips from Bozeman to Missoula and Butte for court hearings and client meetings. Hud says the case is complex, because 1) he had to do "extensive research" into whether his client's prior conviction would count toward his criminal history category, and 2) the Government was slow in making a motion for downward departure under U.S.S.G § 5K1.1, which prompted Hud to file a motion for an evidentiary hearing that was denied. Because Hud has persisted in his argument, I examined his claim in detail and as discussed above, looked at the District of Montana history on CJA voucher payments for the past three years. Based on that analysis, it is my view that Hud's request for excess pay is not warranted and it is, in fact, unjustified.

---

**1.** The claimed expenses of $1,561.06 do not count against the statutory cap for attorney compensation. *See* Section 2.22(B)(1)(i) of the Guidelines for the Administration of the Criminal Justice Act.

## 1. Interviews and Conferences

 The record belies Hud's claim that the case is extended because his client does not speak English. Hud states, "All of the Defendant's interviews (about the facts of the case, the Discovery, the plea agreement, the change of plea, etc.) and his three debriefings had to be conducted through a Spanish interpreter which therefore significantly increased the time that would be normally required for these functions." Doc. No. 116 at 3. Hud had nine conferences with his client during the case, totaling 12.2 hours of conference time. This claim is a reasonable amount of attorney-client conference time in a drug conspiracy case such as this and it is not significantly over what would normally be required. Because Montana is not a bilingual state, very few CJA attorneys in Montana speak Spanish. The norm where the defendant speaks Spanish is for CJA counsel to obtain the services of an interpreter to communicate with clients. The reality of a non-English speaking defendant is not grounds for finding a case extended. An exception exists if translation problems result in more conference time than would be expected in the average case, but that is not so here.

The problem with Hud's claim of conference hours is not the claimed need to engage in cumbersome dialog with his client, but rather is attributable to Hud's excessive conferences with others. The hours billed for client conference time make up just 35 percent of his total conference time. On the other hand, Hud recorded 100 phone conversations and eleven in-person conferences in the case, including six phone conversations with the Fed-

eral Defenders (1.3 hours), eight calls with attorney Monte Jewell (1.8 hours), 14 calls with the prosecutor (3.4 hours), and 11 calls with state and federal law enforcement agents (1.8 hours).[2] Hud talked over the phone to Clerk of Court or chambers personnel 26 times for a total of 5.1 hours, had eight calls with the probation officer for 1.4 hours, and billed eleven calls with the Defendant's sister-in-law for 2.3 hours. He billed 1.8 hours of phone conferences with interpreter Norma Fender in his client's absence, where no translation services were needed.

For the most part, these conferences are not by themselves problematic, but become so when no justification is provided for so many hours logged against the statutory cap. It is troublesome that a lawyer of Hud's experience needs five hours of advice from the Clerk of Court staff. Hud was given an opportunity to explain his claim for conference time at the hearing, and his explanation was unsatisfactory. He attributed his claim of 5.1 hours of conference with court personnel to his inability to obtain documents from the sealed case file. Difficulty in obtaining filings does not justify 26 phone conversations with court personnel, nor can the Court imagine any conversation relating to the filings issue would last 12 minutes or more, as Hud billed several times. Moreover, where filings by other parties are concerned, Hud's proper recourse is to contact counsel for the co-defendants, who are under an obligation to serve him with all filings. With the advent of CM/ECF, electronic filings are automatically sent to registered users and as a consequence, less,

---

**2.** Hourly totals are estimates. Hud frequently lists multiple phone calls and conferences in a single entry and claims the aggregate time for all of them. In those cases, time for each call or conference is apportioned evenly unless the circumstances make it obvious that more

time was spent on one conversation than the other(s). Where Hud has grouped together other tasks in a single entry, such as research or discovery review, hourly totals for those tasks are similarly estimated.

as opposed to more, time should be involved.

Hud also failed to explain the necessity of his conference time with other attorneys not involved in the case. Hud said at the hearing that he needed to talk to Monte Jewell eight times because Jewell represented Defendant Sepulveda in another matter and the two needed to strategize about how best to present Sepulveda's case. Hud observed that he routinely calls the Federal Defenders to get guidance as to how best to represent his clients' interests. While brainstorming with other lawyers can be helpful in some cases, there is a point where it becomes counterproductive. The point of counter production is reached when more time is spent visiting about the case than is spent in substantive work on the case. Hud offered no reasonable explanation to justify his claimed 34.5 conference hours.

██ The documentation and explanations given don't work because they do nothing to support a finding that this case is complex or that it is extended. Routine lawyer work is not a justification for excessive bills. To hold otherwise makes the statutory cap meaningless. The volume of calls in this case supports either an inference that Hud's phone calls are redundant or an inference that they are inefficient and unproductive. In either case, the number of calls and conferences are excessive and unreasonable, which means that this part of his voucher is excessive and will be reduced.

### 2. Travel

██ The Montana federal district court is the largest geographic area district in the lower forty-eight states. Hud's claim for travel time provides the only meaningful support for a designation of this case as extended. Hud traveled round-trip from Bozeman to Missoula six times, and made one round trip from Bozeman to Butte for court hearings, client meetings and debriefings. The resulting travel claim of 42.6 hours is more than half of what would amount to the statutory maximum allotment, if the dollar limit is equated to the expenditure of hours on the case, thus leaving 33.4 hours for other legal work. Hud's travel time is necessary and legitimate, but Counsel overstates its importance to the determination of whether the case is extended. Ordinary travel does not make a case extended. Hud concedes that travel time was factored in when Congress established the statutory maximum of $7,000.00, but argues that the concept of reasonable travel time must be enlarged to accommodate the geographical realities of the District of Montana. In this case, Hud's claimed travel hours well exceed the amount that can be expected in the average case, but there will be no reduction because the claimed travel is reasonable.

Hud goes too far, however, in his suggestion that the remainder of his bill is reasonable once travel fees and costs are taken into account. He argued at the hearing that when travel fees and costs are removed from his bill, it is comparable to the next-highest CJA bill submitted in this case by another lawyer. He argued at the hearing, "I'm just pointing out that if you take out the travel time, my bill is below the limit and it is near [the next-highest bill], is all I'm saying." Hud seeks $12,628.66. The next-highest bill is $6,602.60.[3] Excluding travel fees and costs, Hud wants to be paid $7,171.68, which he says is comparable to a bill for $6,602.60. The problem with this line of

---

**3.** Hud's client has four co-defendants, one of whom has not appeared. One CJA lawyer handled his client's case pro bono and did not submit a voucher. The CJA attorneys for the other two defendants sought payment of $6,602.60 and $3,729.80, respectively.

reasoning is that when travel fees and costs are subtracted from the next-highest voucher, the claim drops from $6,602.60 to $2,566.80. Even if travel fees and costs are disregarded, Hud's voucher more than doubles the next-highest voucher. Hud is also mistaken in his argument that his bill is below the statutory maximum when travel time is removed. If all travel time and all travel costs are subtracted, Hud still seeks $7,148.40.

### 3. Sentencing Issues

 Hud has failed to show that the legal issues he cites rendered the representation in this case abnormally complex. Disputes over whether a prior conviction should count toward a defendant's criminal history are routine, and do not support a finding of complexity. The fact that the Government may have been dilatory in making its 5K1.1 motion offers no more support for an argument that the case is complex. Hud recorded 7.4 hours of research associated with the sentencing (including time to draft his motion for an evidentiary hearing), one hour reviewing a draft pre-sentence report, and 2.4 hours drafting a sentencing memorandum. Hud's total of 10.8 hours spent on the sentencing is in the ballpark with the average drug conspiracy voucher and does not reflect any unusual complexity.

At the hearing Hud offered nothing more to support his claim that this case is complex, and eventually abandoned the position during an exchange with the Court.

### 4. Legal Research and File Review

 Based on the facts in this case, Hud's claim of 39.6 hours combined for legal research and "investigative/other" tasks is excessive. He billed some 7.2 hours reviewing pleadings and organizing his pleading file, including a 3.2–hour session reviewing pleadings pertaining solely to his client's codefendants and 2.2 hours spent organizing his pleading file after the

case was more than four months old. Apart from the 7.2–hour claim for file review, Hud bills 32.4 hours combined in the "Legal research and brief writing" and "Investigative/Other" categories. His review of discovery accounts for 8.3 hours of that time, leaving 24.1 hours for legal research and writing and other work he claims was done on the case.

The record does not support such a claim. Hud filed only two substantive documents. His motion for an evidentiary hearing contained two pages of text and was not complex. He filed a sentencing memorandum of less than four pages in which he briefly touches on the Section 3553(a) sentencing factors. There is nothing in the record, the billing entries or Hud's memorandum to justify his claim for legal research and investigative time or to even hint at what he was doing. The research and writing claims bill more time than is necessary for such simple filings. Hud billed 36 minutes for a motion to change plea featuring 16 lines of text citing no authority. He billed 30 minutes for a motion to extend the motions deadline, again with 16 lines of text and no authority. He billed 78 minutes to draft a two-page motion to continue the sentencing, and 66 minutes to prepare a one-page transcript order form. Each of these four filings is a short boilerplate document, that shows only routine effort. There is no way they could have taken a combined 3.5 hours to produce.

### 5. Reduction

 Section 3006A(d)(3) places the burden on this Court to review CJA vouchers seeking excess compensation and certify to the Chief Judge of the Circuit that the amount requested is necessary to provide fair compensation in an extended or complex case. The statute creates a congressionally mandated stewardship obli-

gation that is taken seriously. I cannot certify a voucher for excess compensation in the absence of a clear record supporting the claim. Even if the Court finds a case extended or complex, and therefore eligible for excess compensation, there is still an obligation to decide whether the actual amount requested is reasonable. A finding of extended or complex status is the beginning of the inquiry, not the end. The complex/extended finding allows the Court to certify to the Chief Judge of the Circuit payment in excess of the statutory maximum. It does not entitle a claimant to whatever amount he seeks. In certifying the amount of excess compensation, the Court is guided by considerations of fairness and necessity. Fairness dictates that a panel member not receive less than that to which he is entitled for the services performed. The requirement that the services for which counsel are compensated be necessary ensures that attorneys who work inefficiently or pad their bills do not reap a windfall for spending more time than needed on a given case. No judge wants to question bills for CJA services but on the other hand, no lawyer should expect the public service rendered on behalf of an indigent defendant to be compensated as if the value of the services were rendered to a Fortune 500 company.

 The amount Hud seeks exceeds that which is fair and necessary for this case. Hud's claim for travel time is the only fact that provides justification for excess compensation. With regard to conference time, a reduction of 14.5 hours, from 34.5 hours to 20 hours, is appropriate and reasonable. The time spent reviewing and organizing the file is unjustified, as is the time devoted to legal research and writing. The combined claim is reduced by ten hours, from 39.6 hours to 29.6 hours.

These changes reduce Hud's hourly claim by 24.5 hours, from 120.3 hours to 95.8 hours. Hud's allowed travel expenses are reduced by $41.47 to ensure that he is not reimbursed for alcohol purchases claimed among his meal receipts. In this case, he billed the court for three bottles of wine. The total amount paid is reduced by $2,295.47, from $12,628.66 to $10,333.19. After the reduction, the amount of the claim counting against the statutory maximum is $8,813.60. The Court is still required to certify the case as extended. Here that certification is justified by the amount of travel in this case. The Court's approval of that amount reflects a determination that the amount of travel required exceeds what would normally be expected by 20 hours. The resulting compensation is on the high end of what is justified in this case, but would be within the bounds of reasonableness.

## B. Hud's Recent CJA Billing History

In an effort to provide context for the consideration of the Sepulveda voucher, as well as to evaluate the credibility of Counsel's argument that this matter is, as the statute requires, unusually extended and/or complex, I examined all CJA vouchers submitted by John Hud in the District of Montana over the past three years. The results are alarming.

There is a delicate and fine line when considering reducing a lawyer's compensation based on a finding that the services in a bill are unnecessary. There is a wide range of time that may within reason be spent on a given task or issue, depending on the attorney. In such cases the Court gives panel members operating at the margin of that boundary the benefit of the doubt. Over time, however, a pattern can emerge tending to show that an attorney regularly exceeds the limits of necessity. In John Hud's case, the trend could not be more clear.

This is the tenth consecutive voucher for which Hud has sought compensation in excess of the statutory maximum.[4] In the past three years, the District of Montana's CJA fund has paid a total of 944 CJA Form 20 vouchers for attorneys.[5] In that time, Hud had 15 vouchers approved, or 1.59 percent of the total. Of the 944 vouchers approved, 30 have involved compensation in excess of $15,000.00. Hud has eight vouchers among those 30, meaning more than half of the vouchers he submitted sought more than double the statutory maximum compensation. In fact, Hud has eight vouchers in the top 24, or one-third of the 24 highest single-payment vouchers over the last three years. According to random chance, the probability that Hud would have just one voucher among the top 24 is 38 percent. The odds against Hud randomly appearing eight times in the top 24 highest vouchers are better than 2,200 to 1.

Even more telling is the fact that Hud's vouchers are clustered near the top of the payment list. His are the two highest-paid vouchers of the past three years, and three of the top four. For the past three years, he is the only attorney to be paid more than $30,000.00 for a single voucher, and it has happened twice. Of the top twelve highest-paid vouchers, six belong to Hud. The odds against him randomly claiming six of the top twelve vouchers are better

than 20,000 to 1. If Hud's pending voucher for *U.S. v. Hendrickson* is approved, he will have the top three highest-paying vouchers of the past three years. The odds of that happening randomly are 1 in 307,165.

The total amount paid on Hud's 15 approved vouchers is $233,392.78. Hud's three pending vouchers, if approved, would raise his compensation to $297,502.94 on 18 vouchers, for an annual income of $99,167.64 drawn from the public coffers. It is imaginable that an attorney accepting a very high volume of CJA cases could carve out a reasonable living working exclusively on such cases. It is far less plausible, and in fact unacceptable, for an attorney to receive nearly $100,000.00 of the taxpayers' money as compensation for handling six indigent criminal defense cases per year.

Hud dramatically outpaces his CJA peers in virtually every quantifiable category. His average compensation for the 18 paid and pending vouchers is $16,527.94. The district-wide average payment per voucher is $4,597.11.[6] Hud attempted at the hearing to explain the incongruity by noting that he handles many multiple-defendant drug conspiracies, which require more time than the average case.[7] The district-wide average claim in

---

4. Hud has a still-outstanding CJA bill for $12,826.76 in *United States v. Quinones,* CR 05–73–BLG–RFC–02. The Court found the fee excessive and advised Hud of its intent to reduce the claim to $7,812.76. *See* Doc. No. 165. Hud has filed a written response. *See* Doc. No. 167. He has a second pending voucher seeking $38,654.74 for his services in *United States v. Hendrickson,* CR 05–68–BLG–RFC–06.

5. The three-year sample set consists of all attorney vouchers paid between July 23, 2004 and July 23, 2007.

6. District-wide averages are based on all vouchers paid during the first six months of 2007. Hud is not prejudiced by the use of this smaller sample set, however, as his per-voucher average during the same time period, including pending vouchers, is $20,975.40, over $4,000 more than his three-year average.

7. CJA vouchers for drug conspiracy cases request a higher average payment than any other case type. Nine of Hud's 18 paid and pending vouchers are drug conspiracy cases.

drug conspiracy cases is $6,546.40. Hud's average claim for a drug conspiracy case is $21,011.21. Even when controlling for case type, Hud's bills dwarf those of his peers.

*Voucher Average Comparison*
*John Hud (7/23/04–7/23/07) v.*
*District of Montana (1/07–6/07)*

| | Average Compensation Paid Per Voucher |
|---|---|
| **District of MT** | **$ 4,597.11** |
| **John Hud** | **$16,527.94** |

*Drug Conspiracy Comparison*
*John Hud (7/23/04–7/23/07) v.*
*District of Montana (1/07–6/07)*

| | Average Compensation Paid Per Drug Conspiracy Case |
|---|---|
| **District of MT** | **$ 6,546.40** |
| **John Hud** | **$21,011.21** |

### Compensation Per Voucher
#### for All Vouchers & for Drug Conspiracy Cases

Avg. Comp. Per Voucher Avg. Comp. Per Drug Conspiracy Case

District of MT John Hud

Nor can Hud claim that he has been saddled with especially complex drug conspiracies necessitating such bills. This is apparent from an examination of Hud's bills relative to those submitted by counsel for Hud's clients' co-defendants in multiple-defendant cases. Even here, Hud manages to bill much more than his peers regardless of the type of case. Although drug conspiracies are not all the same, and some are more complex than others, attorneys representing different defendants in the same case generally are confronted with similar levels of complexity. The claims submitted by Hud and his CJA colleagues in each of Hud's multiple-defendant cases over the past three years are listed below.[8] In all but two cases, Hud

8. The letters "CJA" appear in the place of each attorney's name. A "-p" denotes bills for attorneys who handled only a portion of a defendant's case or who submitted a partial bill and have not sought full compensation. Where multiple CJA lawyers combined to bill the entire representation amount for a given defendant, the number of lawyers involved is listed.

has the highest bill, often by a comfortable margin. When extreme travel requirements are taken into account Hud is the leader in every case.

Byron Miller, CR 03–77–BLG

| | |
|---|---|
| **Hud** | $17,058.14 |
| CJA | $ 6,905.99 |
| CJA-p | $ 5,641.95 |
| CJA-p | $ 4,381.24 |
| CJA | $ 4,271.51 |
| CJA | $ 2,869.84 |

Andrew Lucero, CR 03–27–BLG

| | |
|---|---|
| **Hud-p** | $19,353.09 |
| 3 CJA | $15,753.32 |
| CJA | $12,985.80 |
| CJA-p | $ 8,095.47 |
| CJA | $ 5,676.35 |
| CJA | $ 4,578.24 |

Donald Bitz, CR 04–87–BLG

| | |
|---|---|
| CJA | $20,409.24 (99 hrs. travel) |
| **Hud** | $16,188.45 (39 hrs. travel) |
| CJA | $12,300.57 |
| 2 CJA | $11,922.88 |
| CJA | $10,057.57 |
| CJA | $ 8,926.16 |
| 2 CJA | $ 7,726.85 |
| CJA | $ 5,152.25 |
| CJA | $ 3,821.40 |
| CJA | $ 3,494.25 |

Victor Rivera, CR 05–38–GF

| | |
|---|---|
| **Hud** | $23,867.76 |
| CJA | $16,368.06 |
| CJA | $11,922.37 |
| CJA | $ 8,598.63 |

Esak Abraham, CR 06–16–BLG

| | |
|---|---|
| **Hud** | $19,791.47 (19 hrs. travel) |
| CJA | $18,075.71 (87 hrs. travel) |
| CJA | $10,888.06 |
| CJA-p | $ 8,611.05 |
| CJA | $ 6,955.20 |
| CJA-p | $ 6,187.64 |
| CJA | $ 5,807.62 |

Marcos Quinones, CR 05–73–BLG

| | |
|---|---|
| CJA-p | $15,159.65 (65 hrs. travel) |
| **Hud-p** | $12,826.76 (21 hrs. (travel) (pending) |
| CJA | $ 5,579.62 |
| CJA-p | $ 5,579.30 |

Tyler Hendrickson, CR 05–68–BLG

| | |
|---|---|
| **Hud** | $38,654.74 (pending) |
| 3 CJA | $11,652.53 |
| CJA-p | $10,915.32 |
| CJA | $ 7,088.00 |
| CJA-p | $ 2,683.86 |

Victorino Sepulveda, CR 05–24–BU

| | |
|---|---|
| **Hud** | $12,628.66 (pending) |
| CJA | $ 6,602.60 |
| CJA | $ 3,729.80 |
| CJA | pro bono |

In the cases listed, Hud's bill was exceeded by that of another lawyer only two times. In each of those cases, the difference in travel time provides the margin between the leading bill and Hud's. Hud's vouchers consistently exceed those of co-counsel, often by wide margins, even where he handles only part of the case. At the hearing Hud suggested that the difference between he and his peers, at least as far as drug conspiracies are concerned, is that Hud spends more time reviewing discovery than his CJA counterparts. It is certainly true that Hud bills much more time for discovery review than the average CJA attorney. The problem is that Hud bills much more time than the average attorney for nearly every other task as well. The average number of out-of-court hours billed per voucher in the

**1114**

District of Montana is 44.05. Hud's three-year average for out-of-court hours is 164.31.

**Out–of–Court Hours Comparison**
*John Hud (7/23/04–7/23/07) v. District of Montana (1/07–6/07)*

| | Interviews/ Conference | Obtain/ Review Records | Research & Writing | Travel Time | Invest./ Other | Total |
|---|---|---|---|---|---|---|
| District of MT | 14.21 | 8.05 | 8.36 | 8.79 | 4.65 | 44.05 |
| John Hud | 36.53 | 1.11 | 25.31 | 31.13 | 70.23 | 164.31 |

## Average Out-of-Court Hours Claimed Per Case

District of MT John Hud

## Total Average Out-of-Court Hours Per Case

Total Out-of-Court Hours

 District of MT John Hud

Hud would have the Court believe that in each case he has by coincidence been assigned the most difficult defendant and the most complex and time-consuming legal issues. A comparison of Hud's vouchers to those of his colleagues tells a different story, showing that Hud will reach lofty totals for his CJA bill in almost every case, regardless of the circumstances. While his arguments for excess compensation might seem sufficiently compelling as to warrant giving him the benefit of the doubt in an isolated case, the argument breaks down when one looks at the big picture.

One of the reasons why Hud's bills soar over the statutory maximum is that his cases tend to last longer than average, prodded along by continuances sought mostly by him. At the hearing Hud implied that his cases are often continued due to motions made on behalf of other defendants in the case, stating:

I'm not the only one that's making a motion to continue … I've had at least three or four cases where we're ready to go to trial, a new guy comes in to the case, and all of us get kicked over, all of us will be in it for six months, year and a half, what's the fairness in that?

Hud requested and received a total of 37 continuances in the 18 cases for which there are paid or pending vouchers over the past three years. He has an average of 2.06 continuances per case. The total number of motions to continue affecting Hud's client and filed by lawyers for other defendants in those cases is 14. Taking into account continuances sought by other counsel, Hud has enjoyed an average of 2.83 continuances per voucher. The district-wide average number of continuances per voucher is 1.03. The Court has reviewed these documents. They do not portray a pattern in which Hud repeatedly prepares for trial only to have the trial date continued due to the needs of a co-defendant. The pattern that is revealed is one in which Hud expects the Court to set its docket in accordance with his schedule, rather than setting his calendar in accordance with the Court's scheduling orders. Hud is frequently unprepared to proceed to trial under the original schedule.

**Continuances Comparison**
*John Hud (7/23/04–7/23/07) v.*
*District of Montana (1/07–6/07)*

| | Average No. Of Continuances Per Case |
| --- | --- |
| District of MT | 1.03 |
| John Hud | 2.83 |

## Avg. No. of Continuances Per Case

Avg. No. of Continuances

District of MT John Hud

A particularly troubling incident, and one that does nothing to bolster Hud's credibility on any issues related to CJA vouchers, occurred in the Hendrickson case. Hud sought a continuance of his client's September 21, 2006 sentencing in the Billings Division. The reason given was the need to be available for Sepulveda's trial before this Court in Butte beginning September 19, 2006. But on the same day that Hud filed his motion to continue Hendrickson's sentencing (September 5, 2006), Hud drafted a motion for Sepulveda to change his plea, which was filed the following day. Hud knew on September 5th that Sepulveda would not be going to trial on the 19th, but nonetheless used the trial as an excuse for a continuance in the Billings Division. This incident alone gives rise to serious question about his candor.

Another recurring problem with Hud's vouchers is his practice of seeking reimbursement for the purchase of alcohol. Alcohol may not be claimed as an expense on a CJA voucher. The Introduction to the Criminal Justice Act Panel provided to all CJA lawyers by the Federal Defenders states that in determining whether actual expenses are reasonable, "counsel should be guided by current travel and subsistence limitations for federal judiciary employees. The clerk's office can provide information on such limitations." Introduction at p. 8. The Introduction also cites paragraph 2.27 of the CJA Guidelines, which states that attorneys are subject to the travel rules for federal judiciary employees. The Judiciary Staff Travel Regulations, available in the clerk's office, state that "[a]n employee may not be reimbursed for the purchase of alcoholic beverages." Travel Regs. at p. 33.

In the past three years Hud has billed and been compensated for 20 bottles of wine, one glass of wine, three margaritas, and three beers. It is possible that Hud billed and was reimbursed for other alcohol purchases, because many of his meal receipts are not itemized. Hud's total known alcohol payments over the past three years amount to $276.77.

Hud had alcohol claims denied on two vouchers in the Great Falls Division in January of 2006, but still continued to submit alcohol expenses for reimbursement in the Billings and Missoula Divisions. When asked at the hearing about his practice of claiming his alcohol purchases as expenses, Hud offered a number of explanations, stating, "Your Honor, I was not aware—part of the dinner bill—recently I found out the government doesn't pay for that, fine, and it's always been deducted as far as I know. I just put it in the dinner bill."

Hud later added, "Nobody's ever told me you're not allowed to bill alcohol. I bill what the dinner bill is and if somebody deducts it, that's fine."

Hud's statements on this issue are not credible. He concedes that he has seen alcohol deducted from his bills, but claims to have been unaware that alcohol is not an allowed expense. He states that alcohol has always been deducted from his bills, but in fact most of his claims for alcohol have slipped through and been paid. He failed to provide a persuasive explanation for why he continued to bill for alcohol even after he had alcohol claims disallowed on prior bills. His suggestion that the alcohol was a single item on larger dinner bills that he did not bother to differentiate is at odds with the receipts attached to his vouchers. In many instances, this case included, Hud's alcohol receipt contains no other items and is in addition to a separate dinner receipt for the same day.

There is overwhelming evidence that Hud is either padding his CJA bills or is woefully inefficient as an attorney. Hud repeatedly assured the Court at the hearing his claims are not fabrications. It is not necessary for this Court to make a determination as to whether Hud's bills are the product of deliberate deception or something more benign. Hud is either submitting false vouchers or he requires many more hours than other attorneys to perform routine tasks. In either case, he has proven to be an unacceptably poor custodian of the public trust. When an attorney is paid out of the public funds, he has an obligation to limit needless expenses to the greatest extent possible while still providing full and fair representation for his client. Hud's bills display no trace of such prudence and restraint. A court that would allow such a clear pattern of excess to continue unchecked cannot call itself a faithful guardian of the public fisc. The Congress expects more. The Chief Judge of the Circuit expects more. The public expects more and the Bar should expect more.

Accordingly, IT IS HEREBY ORDERED that the allowed CJA payment on John Hud's voucher in CR 05–24–BU–DWM–04 is reduced to $10,333.19. The Court certifies that the amount in excess of the statutory maximum is necessary to provide fair compensation because the case is extended due to travel requirements.

The Clerk of Court is directed to notify John Hud of the entry of this Order.